Hold this court session in Lafayette Park. Judge Shaw is unable to attend today but he will be participating as a member of the panel using the tape that we will be making today of the argument. Today we have two cases. One is argued, the other is submitted on the record and on the briefs. The submitted case for the tape is 06-3358, Stonyhove v. MSPB. The argued case is 06-1577, Imagination & Information v. Defense Department. Mr. Phillips, are you ready? Thank you, Your Honor. You are reserved And neither is this case where there is a useful contrast between 40,000 private party commercial vendors who are using electronic data interchange in the fall of 94 and the 300,000 vendors interested in DOD business in the fall of 94. There are a number of different numbers of vendors using these systems that are in this record. And I thought it would be useful first to describe what those numbers are. Well, as I understand it, the system itself basically is an electronic system that replaces the old telephone book type of system that the government had for Defense Department procurement. So all of the items and elements that they are looking for is now online and people can look at those particular products that they might want to sell to the federal government and they look it up online, right? Not exactly. What happened here, Your Honor, there were five existing Defense Department electronic data interchange systems. This is at the dawn of the Internet when this happened. And these systems were the Navy's Automation and Procurement Accounting Data Entry, the Navy's Aviation Supply Office, Integrated Technical Item Management Procurement System, the Air Force Menu Assisted Data Entry System, the Army Standard Army Automated Contracting System, and the Defense Logistics Agency's SAMS Procurement by Electronic Data Interchange. These were existing, stand-alone electronic data interchange systems, somewhat like the system that we have today that comes on the Internet. But not exactly, because this was when the Internet was just getting started. What happened here was, per the Process Action Team report, the Defense Department gathered these five systems together and created for them a standard interface whereby vendors interested in electronic business for small purchases with the Defense Department could sign on once and access all the electronic transactions on all these five systems. In these five systems, per the board, there were 124,265 vendors in the fall of 1994. Per the audit agency, the Defense Contract Audit Agency, the board miscounted and there were 80,000. Per the Inspector General of the Department of Defense, in October of 1997, there were 98,884 vendors in local activity-specific electronic data interchange systems. That report, in fact, excluded two of the five systems that were to be put into the system, the APAID system and SPEDI. Mr. Phillips, here, I want to move on because we don't have a lot of time for argument. You've got a ruling here that there's a breach. Your client has suffered a breach of a contract. The government's responsible for the breach, but there's no remedy. Yes. The remedy that you sought was lost profits. You weren't seeking reliance or restitution damages or any other form of contract remedy, so those are off the table. Either you're going to get lost profits or you're going to go home empty-handed. Now, I realize that in the CACI case, with which I think you're familiar, that the same essential system that we're talking about in this case was involved in that case. Yes. In that case, and I think in this case as well as in that case, whether you can prevail or not will depend on the quality and the effect of the expert testimony that was put in. In your case, it's Dr. Tracy, I believe, in this case. Your Honor, we don't contend that the board wrongly decided that Dr. Tracy was not credible. What we do contend is that having thrown out the modeling case that Simplex put forward, the board was obligated nonetheless to find a remedy for Simplex. You're drawing a line between the credibility of the expert and the model that he proposed. I'm saying that that's out. I'm saying there's plenty of evidence in this record that was before the board by which the board could have... Other than Dr. Tracy's testimony. Yes, exactly. Okay, so that's very helpful to me because the question I wanted to ask you was, let me preface my statement by saying I realize that this court did not write an opinion in the Kaki case. The case was affirmed under the Rule 36 without an opinion, but I've read the opinion of the board in the Kaki case, and it seems to me that it's, if not a carbon copy, it's in pairing material with the opinion that your client got. And so what I was curious to know is, in what respect is the evidence that's in your case, apart from Dr. Kirby, whom we've taken out, Dr. Tracy, pardon me, thank you very much, in what respect is the record testimony on which you rely an improvement, if you will, over Dr. Kalos' model, which was found to be insufficient, as you know? I'll turn to just that. Thank you. Here is the evidence in this record by which a jury verdict could have been constructed. First, my client, Simplex, was charging $50 a month in January of 1995. In 1996, he went up to $75 a month, so there's a monthly rate. The next issue is market share. The Defense Department had an organization called the Electronic Commerce Center, and the Electronic Commerce Center compiled monthly records of what the share of the transactions were passing across the hubs. We only have the reports for July of 1995 and August of 1995, but those two reports for purchase order transactions, and in the electronic scheme here, they were called 850s. In July of 1995, Simplex had 15% of that business, and in August of 1995, Simplex had 17% of that business. Dr. Tracy used 20%, but the record shows 15 and 17. Next is the question of profit rate. The audit agency, the defense contract audit agency for the Defense Department, put together a report of the profit rate of the publicly held value-added networks that were conducting this business.  And per the audit agency's own analysis, that profit rate was on average 2.3%, and that ranges from a maximum return of 13.8 to a yearly loss of... That's a profit rate of publicly held entities, other people? Pardon? That's a profit rate that was keyed to, you say, publicly held entities? Yes, those are SEC reports. So is that—am I wrong in thinking that could be an apples-and-oranges comparison? Your client is privately held. Perhaps your client isn't similarly situated as to the publicly held companies? Well... I mean, for example, on a given day, the Coca-Cola company doesn't enjoy the same profits as the PepsiCo. Yes, I understand that. And so you need to get oranges and oranges if you're going to try to associate yourself with somebody else's profit rate? Yes, but on the other hand, for a jury verdict, the law as announced by this court says all I have to have is a reasonable approximation. But you've got to show causation before you can even get a jury verdict. Oh, I can show causation. And gross. That's not hard. Let me explain— Why wasn't all of this evidence then put together through the expert witness? I mean, there are bits and pieces here and there. Some of it was. Some of it was. You expect the court to really go through and tease out all of these particular issues without having the benefit of the expert testimony? Your Honor, I think that was the board's duty. Yes, I did. You think the board should have done that? Yes, I do. It's not incumbent upon the party to show exactly when you're asking for lost profits of $8 billion to be able to show a substance of the underlying requirement for establishing the lost profits. The $8 billion, Your Honor, is a figure that came up that was the product of a layman's analysis. It is what it is, and it's obviously not right. That said, the board had an obligation under Story Parchment and other cases to come up with a remedy because the board found a breach. Probably not every. I mean, for the longest time, the Supreme Court has told us that not every breach will enjoy a remedy. I understand. There is such a thing in life as a wrong for which there's no remedy. You have to accept that. Yes, I accept that, but this court has found remedies for the savings and loans on lost profits and does so routinely, and the same should occur here. I think one element that drove the board, both in Kaki and in this case, is that the guilty party, if you will, of the breach is the United States government. But it wasn't the United States government that was going to supply the measurement for the harm to you. It was business that you would have engaged in with third parties who themselves would have, in essence, used your client as a funnel or as a pipeline to get to the government to do the business. That's right. And as I read the Kaki decision, and this one too, as the board said, in those circumstances it makes it even harder for the board to find entitlement to lost profits against the government. It was hard for the board because, for one thing, the Armed Services Board typically deals with equitable adjustments and not lost profits. Not lost profits of the sort that this court and the court below, the Court of Federal Claims, considers routinely in the Winstar cases. That's the first problem. Nonetheless, the law is clear. And the law is, and recently reaffirmed, frankly, by this court in Citizens Federal on January 24th, is where the damage is soldered within the range of foreseeable consequences. And these were. There's a remedy. Third-party revenues had, for many years, formed the basis for recoveries in this court and in the Court of Federal Claims. And I refer to Neely, which was a coal mining lease. Did the government reserve the right to itself to shut down this enterprise whenever it wanted to? Yes. Doesn't that hurt you? The government didn't shut the enterprise down. And this is not a claim that the government shut the enterprise down. In fact, this contract was put in place in March of 94. Simplex was qualified to pass these transactions in April of 94. And Simplex continued doing so through February of 99. Simplex was in existence and operating longer, as far as I know, than any one of the other 31-band contracts. Mr. Phillips, you're well into your rebuttal time. Do you want to try to save some time for rebuttal? Thank you. We'll restore three minutes of your time. Thank you. Thank you. Ms. Kirshner? May it please the Court. The Board correctly determined that Simplex was not entitled to a jury verdict determination of lost profits. As the Board found initially in its first decision and then also on reconsideration, there was no basis in the record for an award of jury verdicts. Mr. Phillips, with admirable candor, has taken Dr. Tracy out of the case. Dr. Tracy was the witness that stood in front of the Board to try to put together the pieces in order to sustain a lost profits award. And I think, as I say, I take it with admirable candor that Mr. Phillips says that Mr. Tracy's gone. However, Mr. Phillips believes there's evidence in the record that the Board did not greet. The Board didn't look at the record and say, okay, Tracy's gone. We find him not to be believable. But there is this additional evidence in the form of the January 95-96 amounts per month, the market share, the profit margins, etc., that Mr. Phillips, on behalf of his client, says he was entitled, if you will, to an opinion from the Board that rejected that evidence. That's what I hear him to be saying. So it's like a process case now. I think since the Board didn't adjudicate specifically the measuring points, if I can call them that, the data points that I believe Mr. Phillips has identified today, it sounds to me like what he's saying is we ought to remand the case to the Board and tell it to look at those factors and then give him an opinion, yes or no, on whether he's entitled to lost profits. I think I hear that he can tell me on rebuttal if I've misunderstood his case. Now, if that is his case, and if the general proposition is that wrongs should find remedies, and I can find plenty of cases that stand for that proposition, what's the—shouldn't we consider a remand to tell the Board that it didn't do its job as it should have? The Board did look at all the evidence. It looked at all the evidence that Simplex's counsel is bringing to the Court's attention this afternoon. For example, on the question of market share, the Board looked at all the evidence, and the Court could look at it now also. On the question of market share, what was presented is in the record at Appendix 442. This is an email sent by Mr. Chiesa to Dr. Tracy, and in this email, Mr. Chiesa sets out the numbers of purchase orders that his van has over various months of about a year in 1997, and he compares that to the number of purchase orders going through the system over the same period of time. That was the evidence on market share that was presented to the Board. Now, refresh my recollection. And the Board greeted—considered that evidence and said what? The Board said that that was not reflective of market share, that the number of purchase orders running through the system has no relationship to what that market share actually is. He also said that that data was basically junk. It hadn't been verified. It hadn't been—Dr. Tracy hadn't looked at any client files to see whether they were in fact— What would be an appropriate predicate upon which to premise a market share? In this case— Given this enterprise that we're talking about. Correct. If you'd been charged with defining a market share for your client, how would you have done it? The Board pointed out that the way to define market share, which would be corresponding to the claim presented, would be to look at sales, to look at the total sales in the market and to compare it to the sales of Simplex, or what Simplex's sales were. But there was no information on the total sales in the market and no information on the sales associated with Simplex's van. The only information that was presented was this email, which gave purchase orders. Now, the other documents— The purchase order was an order that Clevenger Industries— What was being purchased? The government was purchasing pencils from Clevenger Industries? A purchase order is called an 850. It's actually a type of electronic transaction. It's an electronic transaction that goes through the system, and you got a contract as a result of it. So purchase orders would not have any reflection on market share. A van could have one customer who was doing very, very well and had hundreds of thousands of purchase orders. So you could count those up and attribute them to Simplex, but it wouldn't mean that Simplex was doing well. Simplex is counting its beans, isn't it, as a result of the service charge it has to the people that visit its site, so to speak, and then a transactional cost, right? Not a transactional cost. There's a monthly charge, as Simplex Council pointed out. A monthly charge was either $50, then went up to $75. So the charges didn't depend on how well the vendor was doing or on how many transactions the vendor was sending through the system, how many times it used the system. It had nothing to do with that. It was just an access charge to the system, wasn't it? Correct. It was an access charge. And there were no further revenues that Simplex would be making other than the access charge? Yes, that's what they made each month, either $50 or $75. No dispute on the prices here that Simplex was charging its customers. The other information that was in the record... Well, that's the same with everybody else who was playing in the field, CACI and the others. They were just these canals that you went through to get at the government? They were vans, and they charged for their services. Not all of them charged in the same way, but this van was using a monthly charge. Now, here, the other information... I'm just trying to get a handle on what a true market share would be. Maybe it would be how many million people were there that visited all these various channels, as I'm calling them, and then what percentage of them did you enjoy business with? Well, if your profits are depending upon your monthly charge, then it would seem that the way to get at market share would be to look at numbers of customers, number of customers in the entire market, how many customers did you have, how many customers did you expect, that type of analysis. That's not the type of analysis that was ever presented in the record. That would also have to assume that all the other players in the field were operating the same way, because if other players were marking their revenues off of different indicators, you'd have a harder time putting together your market model. That's certainly true. The other thing I just wanted to point out, you asked about the other evidence in the record. The other evidence in the record is at appendix page 2772, and this is no better than the purchase order evidence. It's actually very, very similar. What this looks at is three types of transactions, 850s, 843s, and 838s. These are, again, transactions running through the system, and the analysis presented this afternoon is the assertion that we should just add up these numbers, make a ratio of total transactions. But you could probably come up with a lost profit based upon the number of access or reaching into the system that a person would make. If it's a $50 a month charge, if it's 100 people accessing it versus 200, you would still be able to make a model showing lost profits. But that's not what was in this record. What was in this record was numbers of transactions, either looking at the number of purchase orders or looking at three other types, three types, one including purchase orders and then two other types. But you're saying that those purchase orders could all come from one person? Well, one or two. It's not reflective of whether you're going to actually make a profit in your business. And, you know, this argument here to use the three types of transactions, that argument was not made specifically to the board, so the board does not specifically address it, but the evidence is no better. It's still looking at numbers of transactions and trying to come up with market share based on numbers of transactions, and there's no relationship. And the board pointed that out in its opinion. So you have... Is that fact alone fatal to the lost profits claim? Certainly. Because I don't think there's any... There's no debate about 50 bucks a month in January of 95, up to 75 bucks in 96, right? We don't dispute the prices. There's no dispute about that. And so assuming even if the... Assuming for purpose of argument that 2.3% is the correct profit margin, which is what Mr. Phillips is pointing to today, even assuming that, you say, he still wouldn't be able to prevail because he never proved market share. Correct. And then also on the question of profit rate, the testimony given by DCAA was that Simplex was not profitable itself. And then what they gave was an extreme range for... Up to... Forget the exact numbers, but they presented an extreme range. You could have been doing dismally as a van. The average profit rate is not necessarily reflective of what Simplex would have earned. There's no reason to think that Simplex would have been profitable based on those numbers. Now, there was also a fair bit of proof of what the costs of the VLA van were. Simplex just had its costs for the entire business. Let me shift just for a second because we are running out of argument time. You no doubt heard when I said to Mr. Phillips, well, you know, you can't get a jury award unless you've got causation, which is the law from the longest time back. And he said, I got causation nailed. You know, I've got it down. He didn't have... I didn't pursue with him why he thought he had causation, but he opened that issue. What's your response to his contention that he was entitled at least to a jury award because he had shown causation? The board specifically found against Simplex on that point. The board found, according to the opinion, the certainty that profits would have resulted but for the government's breach is under the circumstances a speculative proposition at best. And the findings that go to causation are primarily in factual findings 9, 39, 41, and 61. And all of those factual findings have not been challenged by Simplex, and they all amply support the conclusion that there was no... that they had failed to establish causation. And causation is a question of fact, and that factual finding was amply... Just help me out for a second. Assuming, for purposes of argument, that the fact findings at 9, 39, 41, and 61 had been challenged on appeal, and assume we had found them all clearly erroneous, how would you go about calculating a jury award on lost profits given the nature of this enterprise? Well, one would have to have proof of lost profits. One would have to have... What is a jury award, anyway? Am I wrong in thinking that a jury award is just a free throw, like, you know, an extra free shot in basketball when you don't have enough proof to prove something else, but equity and justice suggest there needs to be a remedy until you concoct one? No, it's not a concoction. It definitely has to be... The language used in the court's opinions is a reasonable approximation of damages. So there has to be a body of credible evidence that supports the computation. And here, there was no body of evidence that could have been used. Simplex did not allocate its costs of its... And you think of a jury verdict case in which there was a body of evidence, if you will, that supported a jury verdict? What would you look to? I mean, Simplex was in business. It was charging money to people who paid it money to have this valve opened up through which they could gain access to the government to try to do business with them. Real transactions were happening. Probably the number of transactions that were engaged in are countable. They can prove that. Is it the fact that they had no proof of profitability that damages them on a jury verdict? That certainly hurt them. If they had been able to show that they were a profitable firm before they signed on to this... Is there a case that says you can never get lost profits unless you have been profitable at some stage in your game? No. I didn't think so. You're asking me how it might have happened. Right, well, that's what I'm trying to get at. I mean, the fact that they were... They were brand new. I mean, this was like rocket science way back when the Internet was brand new. So I just was wondering why there maybe might not have been sufficient, assuming that these fact findings that you claim or that you assert were not challenged, that supported the board's judgment that there was no access because of no cause, no access to a jury verdict. It looked to me like there were enough data points that you might be able to cobble together something that would survive appellate review. They didn't even keep their records in a way that you could use their data to come up with what the revenues of the VLA ban were. The only data presented was data... Were they engaged in any other businesses? Yes, yes. There were no segregation, as I recall. There was no segregation of cost, no segregation of revenues. They were a ban for the state of California. They had business with Lawrence Livermore. They did services for the VA. They provided services for other government agencies. But they never, ever allocated costs or revenues to this particular part of their business. So there was no... Because they didn't keep their records appropriately to come up with lost profits, there was nothing that the board could do. Thank you, Ms. Kirshner. Thank you. Mr. Phillips, you have three minutes restored. Thank you, Your Honor. Your Honor, I have loose pages from the appendix that show this market share. I'd be more than happy to... Why don't you just signify for the record what pages you're referring to. 2774 and 2772. 2772 is July of 95. These are DOD data. They show the number of purchase order transactions for all of the certified bans for the month of July. And what they show, there were 3,629 purchase orders processed through this system in July of 95, and of those, Simplex processed 573, and that is 15 or 17 percent. The reference that you made was to the appendix? Yes, Your Honor. 2474 and 2472? Yes, Your Honor. Thank you. The basic problem with this case and why Simplex is entitled to lost profits is that the Defense Department, having promised to give these bans exclusive access to these electronic transactions, the electronic transactions for which Simplex was charging $75 a month, gave them away. And so the vendor... What's the difference between, essential difference between the facts in this case and the facts in Katke? The essential difference? Why is your client any better off than Katke was? For one thing, my client was running an existing business. How did Katke try to prove market share? They tried to prove market share through an expert, and that expert got every bit as far as Mr. Tracy did, which was not far. But in this record, and not in the Katke record, are these monthly reports by DOD that show market share. That's the almost most essential difference between this and Katke. The problem here is that, while having promised, if you give us these free services bans, we will give you exclusive access, DOD was busy giving away the same transactions for nothing. So not surprisingly, vendors refused to pay for the bans. But does that go to the breach? Yes. So the breach is conceded. The breach is there. I understand, but it goes to the essential point of proving lost profits. Why were there lost profits? Because DOD was giving away that for which it expected the bans to charge. Thank you, Mr. Phillips. Thank you. The case is submitted. Thank you. Thank you very much. All rise.